UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
RICHARD ROBINSON,                              :
               Plaintiff,                        :         04 Civ. 5899 (PAC)
                                               :         OPINION & ORDER
  -   against -                                 :
                                               :
THE AMERICAN STOCK EXCHANGE LLC.,              :
               Defendant.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        HONORABLE PAUL A. CROTTY, United States District Judge:

        Plaintiff Richard Robinson ("Robinson")[1] brings this action against Defendant American Stock Exchange LLC. ("AMEX"), his former employer, alleging racially discriminatory discharge and retaliation in violation of Title VII of the 1964 and 1991 Civil Rights Acts, 42 U.S.C. § 2000e, et seq. ("Title VII"), 42 U.S.C. § 1981, New York State Executive Law § 296 and New York City Administrative Code § 8-502. Robinson also alleges breach of contract and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Defendant now moves for summary judgment on all claims. The Court grants Defendant's motion and dismisses Plaintiff's claims.

## BACKGROUND[2]

        AMEX is a self-regulatory organization empowered to oversee its own securities market and the participants in that market, under the SEC's ultimate supervision. Robinson, an African-American man, started with AMEX as an at-will employee on February 18, 1976 and advanced to the position of Vice-President in charge

---

[1] Robinson was represented by counsel when this action was commenced, but his counsel withdrew as of December 28, 2005, and he has proceeded pro se since that date.
[2] These facts are derived from the Complaint, AMEX's Local Rule 56.1 Statement and supporting evidence, and Robinson's affidavit in opposition to summary judgment. Sources will be cited only when quoted. The facts are undisputed unless otherwise indicated.

of the Derivatives Trading Analysis Department ("DTA").  AMEX terminated Robinson's employment on June 20, 2003, because of his inappropriate handling of a request for information from the Securities and Exchange Commission ("SEC").  Robinson's claims are based on his allegedly insufficient bonus in 2002, his termination in June 2003, AMEX's failure to grant him severance benefits or a pro rata bonus for the first half of 2003, and AMEX's opposition to Robinson's application for unemployment benefits after his termination.

**I. Robinson's Role at AMEX**

Robinson ran DTA, which was responsible for "regulating the derivatives and options trading activity of AMEX floor members." Compl. ¶ 7.  Robinson's "primary responsibility" was to ensure the market participants complied with AMEX and SEC regulations and "to review and determine whether investigations regarding alleged infractions warranted being forwarded to the AMEX's Enforcement Department or to any of the AMEX's Disciplinary Committees." Id.  Robinson oversaw the Best Execution Department ("BED"), which was responsible for reviewing reports of trading floor activity that could identify violations of AMEX rules.  BED would investigate potential violations and, if they proved serious enough, refer them to the Minor Floor Violations Disciplinary Committee ("MFVDC") for further action.  The Manager of BED, John Riccardi ("Riccardi"), reported directly to Robinson.  Robinson also supervised, inter alia, Thomas Riley ("Riley"), the Manager of the Options Analysis Department.  During the relevant period Robinson reported to Glen Barrentine ("Barrentine"), the acting head of the Division of Member Firm Regulation.

**II. Robinson's Relationship with Barrentine**

Barrentine, a former peer of Robinson's, was appointed acting head of Member Firm Regulation in October 2002. When Barrentine was promoted, Robinson congratulated him, stating that "to say it is well-deserved would be a gross understatement." Affidavit of Peter A. Walter ("Walter Aff."), Ex. E. Robinson testified, however, that even before Barrentine became his supervisor he "felt that because [Robinson] was black Barrentine had a big problem with [his] overall personality," and that he "always got the feeling that [Barrentine] had a resistance to accepting anything [he] said." Walter Aff., Ex. C ("Robinson Tr.") at 91-92. Robinson admitted that Barrentine never acted in a discriminatory or unprofessional manner towards Robinson, or commented on his race, prior to October 2002. Robinson also "felt" that Barrentine discriminated against him based on his race after October 2002. Id. at 99. As to discriminatory actions, Robinson generally asserts that Barrentine regularly interrupted and cut him off when he was speaking in meetings, and "chose to question just about everything I did and everything I said." Id. at 109.

More particularly, Robinson testified that after Barrentine refereed a dispute between Robinson and David Fish ("Fish"), the Director of Rulings,[3] over a ruling on the exchange floor, Barrentine privately rebuked Robinson for the way he had spoken to Fish. Robinson testified that he and Fish, who is white, had been speaking to each other in an identical manner, and that the only reason for Barrentine's rebuke was that Robinson is black. In his affidavit, but not his deposition testimony, Robinson states that Barrentine told him he should not have spoken to Fish "like you are equal." Affidavit

---

[3] Robinson's position of Vice President was higher in the AMEX corporate hierarchy that the Director of Rulings, and Robinson had been involved in selecting Fish for the position.

3

of Richard Robinson Opposing Summary Judgment ("Robinson Aff."), ¶ 50. Robinson also alleges in his affidavit that he saw various emails, not before the Court on this motion, in which Barrentine asked other AMEX officials how he could remove Robinson from his position. Finally, Robinson alleges in his affidavit that Barrentine gave him an unfairly low performance evaluation on or about February 14, 2003, leading to a reduced 2002 bonus. In that same affidavit, however, Robinson states that he "received a good performance appraisal and good bonus" from Barrentine. Id. at ¶ 44.

### III. The SEC's March 18, 2003 Request for Information

On March 18, 2003,[4] Tina Barry ("Barry") of the SEC's Office of Compliance, Inspections and Examinations ("OCIE") requested Robinson produce a log of all investigations conducted by BED during the previous year and a log of all actions taken by MFVDC over the same period. Robinson testified that he asked Riley to provide the BED log and Riccardi to provide the MFVDC log.[5] Riley sent Robinson the requested BED log "approximately two hours" after Robinson requested it. Robinson Tr. at 122. Riccardi provided a final MFVDC late in the day, after a draft log was rejected by Robison due to inaccuracy. Robinson began to review the MFVDC log, but went home before he finished and did not complete his review by 10:30 a.m. the following morning, when Barrentine arrived to review the logs. Robinson never reviewed the BED log, but "based on the fact that it was prepared by Tom Riley, [he] had no concerns regarding its accuracy." Robinson Aff. at ¶ 26.

---

[4] Robinson states that this chain of events began on March 17 rather than March 18, but Barry's email, provided by AMEX, is dated March 18. See Walter Aff. Ex. H.
[5] AMEX suggests, without relying on the information in support of their motion, that the Riccardi was assigned the BED log and Riley the MFVDC log, and that Riley then passed along the MFVDC log to Riccardi.

4

Robinson testified that based on his partial review of the MFVDC log, he realized that it included not only matters on which MFVDC took action, as requested by the SEC, but also matters simply forwarded to MFVDC on which no action had been taken.  Robinson alleges, without explicit contradiction, that at the March 19, 2003 meeting he told Barrentine both that he had not finished reviewing the MFVDC log, and that it contained all matters forwarded to the MFVDC.  Barrentine asked a few further questions about the logs, in what Robinson asserts was a hostile manner, and asked Robinson to draft a cover email to Barry explaining the information that AMEX was providing.  While Robinson was drafting this email, he overheard Barrentine ask Riccardi what the MFVDC log represented and Riccardi answer, incorrectly, that it was all matters on which the MFVDC took action.  Robinson alleges that he then confronted Barrentine about asking Riccardi the same question Robinson had just answered.  During this confrontation he stated that Riccardi was incorrect about the contents of the log.  He finally told Barrentine that "If you feel that a manager knows more about this log than I do, then go ahead.  Take what he tells you." Robinson Tr. at 132.

Barrentine then had Riccardi send electronic copies of the logs to Robinson's computer so they could be attached to the email to the SEC.  He also revised that email, and had it sent to the SEC with the attached logs.  The revised email stated that the MFVDC log did not "show any matter referred to the committee for which the committee took no action" and that the BED log "only shows such matters as were referred to the committee." Affidavit of Glen Barrentine ("Barrentine Aff."), Ex. D.  In addition to the inaccurate description of the MFVDC log, the email incorrectly described the contents of the BED log, which contained matters not referred MFVDC.  More

5

importantly, the BED log wrongly indicated, through its "Action Taken" notations, that some, if not most, of these matters had in fact been referred to MFVDC.

Though the email was sent from Robinson's account, he never checked to see whether it accurately represented the contents of the logs. Nor did he inform Barry or anyone else at the SEC or AMEX that inaccurate information might have been provided. At approximately 4:30 p.m. on March 19, Robinson allegedly asked Riccardi about the incorrect information he had given to Barrentine, and, when Riccardi admitted he had misspoken, told him to inform Barrentine of his error. Riccardi did not approach Barrentine until the afternoon of March 20, when he confessed that the logs included large numbers of matters that were never forwarded to the MFVDC due to a backlog of investigations at BED.

**III. Internal and External Investigations and Termination of Riccardi and Robinson**

Riccardi and Robinson were placed on paid administrative leave on March 21, 2003. Lauren Brophy ("Brophy"), an AMEX Vice President within the Equity Trading Analysis Department, was appointed as the interim head of DTA and tasked to conduct an investigation into the department's general functioning and various representations made by Robinson to the SEC. AMEX also hired outside counsel from Davis, Polk and Wardwell ("Davis, Polk") to investigate the events surrounding the March 18, 2003 SEC request and the general functioning of DTA. On April 4, 2003, Brophy reported a variety of problems in DTA, summarizing that "there exist several areas of substantial regulatory risk and exposure," most notably within BED which was "in major disrepair and needs immediate attention." Affidavit of Claire McGrath ("McGrath Aff."), Ex. D at 3, 7.

6

On June 17, 2003, AMEX was notified of a negative SEC report on AMEX's operations, and specifically informed that "[i]n light of the serious nature of these findings, the inspection report has been referred to the Commission's Division of Enforcement for possible further action." McGrath Aff., Ex. F at 540. Among the problems noted by the SEC was that the submission of the inaccurate BED log on March 19, 2003 "appears to have been a deliberate attempt to conceal serious deficiencies in the Amex's regulatory program for order handling violations." Id. at 551.  The report noted, however, that "[o]nce senior staff became aware that the document submitted was false, they immediately notified the [SEC], placed the responsible employees on administrative leave, and commenced an internal investigation." Id. at 551 n. 14.

On June 20, 2003, Davis, Polk submitted its report on the events of March 18-20.  Based on its own interviews with the relevant individuals and review of the evidence, Davis, Polk found that, "Robinson at least recklessly, if not willfully, permitted the AMEX to submit the [BED] log to OCIE with materially false information in it and with false representations as to its content." McGrath Aff. Ex. 6 at 5.  Davis, Polk further related problems with Robinson's general management approach and concluded that "[h]is negligent supervision of DTA put Amex at regulatory risk." Id.  Davis, Polk summarized its findings as to Robinson:

> Robinson, who understood the inaccuracy of Riccardi's description, appears to have at least recklessly, if not willfully, failed to correct Riccardi's misstatement with the apparent purpose of hiding behind Riccardi's more direct role in managing [BED] and maintaining the log. Such actions are consistent with his overall failure to supervise DTA effectively.

Id. at 7.  Davis, Polk further found that "Riccardi, who was poorly supervised and overwhelmed by his responsibilities, appears to have intentionally misled Barrentine." Id. at 7-8.  Davis, Polk also cleared Barrentine of any wrongdoing or significant error.

On June 20, 2003, after receiving the Davis, Polk report, AMEX terminated both Robinson and Riccardi.  According to AMEX, the decision was made by the Office of the Chairman, consisting of the AMEX's Chairman, Sal Saldano ("Saldano"), the President, Peter Quick ("Quick"), and Michael Ryan ("Ryan"), the Executive Vice President and General Counsel.  Robinson testified that he believed Catherine Casey ("Casey"), the head of human resources, Susan Merrill, and Barrentine were also involved in the decision.

**V. Events after Robinson's Termination**

AMEX did not provide Robinson with any severance package following his termination.  AMEX asserts that it has never granted severance benefits to an employee terminated for cause, and Robinson admitted that he was not aware of any employee terminated for cause who had received such benefits.  Claire McGrath, the General Counsel of AMEX affirmed, without contradiction, that AMEX had no severance benefit plan, but rather would decide to grant severance benefits, if at all, on an individual basis.

After his termination, Robinson applied for unemployment benefits from the State of New York.  AMEX opposed the application because he had been terminated for misconduct, and provided information to that effect to the New York State

8

Department of Labor on July 25, 2003.[6]  Notwithstanding AMEX's opposition, Robinson was, in fact, granted unemployment benefits.

Five days after filing for unemployment benefits, Robinson filed a charge of discrimination against AMEX with the Equal Employment Opportunity Commission ("EEOC") on July 30, 2003.  On or about April 29 2004, the EEOC issued Robinson a "Right to Sue" letter.  This action followed.

## DISCUSSION

**I. Summary Judgment Standard**

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate where "the nonmoving party 'has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof'." Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  In ruling on a motion for summary judgment, the Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."  McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (citation omitted).  Where, as here, the plaintiff is proceeding pro se, the Court must read the plaintiff's pleadings and other memoranda liberally and construe them in a manner most favorable to the plaintiff. See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Summary judgment should not be granted where issues of fact are "genuine," and "a

---

[6] Robinson asserts that AMEX did not oppose an application for unemployment benefits by Riccardi.  It is unclear what basis, if any, Robinson has for this assertion.

reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

**II. Discrimination and Retaliation Claims**

On a motion for summary judgment, employment discrimination and retaliation claims brought under Title VII, 42 U.S.C. § 1981, and New York State and City statutes are analyzed under identical standards. <u>See</u>, <u>e.g.</u>, <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989) (<u>McDonnell Douglas</u> framework applies to both § 1981 and Title VII); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n. 1 (2d Cir. 2000) ("identical standards apply to employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York"). Such claims are analyzed under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). First, the plaintiff must make out a <u>prima facie</u> case of discrimination or retaliation. <u>See</u> <u>Weinstock</u>, 224 F.3d at 42. The burden of proof at the <u>prima facie</u> stage is <u>de minimis</u>. <u>Id.</u> If the plaintiff meets this burden, the defendant must offer a legitimate non-discriminatory reason for its actions. <u>Id.</u> If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is a mere pretext for discrimination. <u>Id.</u>

**A. Discriminatory Discharge**

To make out a <u>prima facie</u> case of discriminatory discharge, Robinson must show that: (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he was discharged; and (4) his discharge occurred under circumstances giving rise to an inference of discrimination. <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134

10

(2d Cir. 1997). There is no question that Robinson is a member of a protected class and that he was discharged, and AMEX does not directly argue that Robinson has not shown satisfactory performance; the sole issue in dispute is whether Robinson's discharge gives rise to an inference of discrimination.[7] "[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination," but they include "actions or remarks made by decision-makers that could be viewed as reflecting a discriminatory animus…, preferential treatment given to employees outside the protected class…, [or] the timing or sequence of events leading to the [adverse employment action]." Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 91 (2d Cir.1996) (citations omitted). Notwithstanding the de minimis nature of his burden, Robinson has not raised a genuine issue of fact as to any circumstances which would permit an inference that he was terminated for discriminatory reasons.

Robinson's discrimination claim rests entirely upon his allegations of racial animus on the part of Barrentine. Indeed, he explicitly admitted that he had no reason to believe Soldano, Quick, Ryan, Casey, Brophy, or any other person potentially involved in the decision to terminate him was racist or discriminated against him on the basis of race. See Robinson Tr. 175-177. The allegations regarding Barrentine are insufficient to show circumstances suggesting discriminatory discharge for three separate reasons.

First, Robinson has not presented even de minimis evidence of racial animus on Barrentine's part. Robinson's subjective feelings that Barrentine was prejudiced are not evidence of actual prejudice, nor are inadmissible hearsay statements

---

[7] As the following discussion will make clear, AMEX's argument that no inference of discrimination can be drawn could also conceivably be characterized as a failure to show satisfactory performance.

11

supposedly made by other AMEX employees. The mere fact that Barrentine would cut off or interrupt Robinson during meetings, even if he did it more frequently to Robinson than to others, does not show racial animus. Similarly, even assuming the Court may properly consider Robinson's affidavit statements concerning the supposed contents of emails not provided to the Court or the defendant, at best, they would show only that Barrentine wanted to replace Robinson.[8] But the Court does not sit as a human resources department; its concern is limited to whether the decision to terminate was motivated by racial animus.[9]

      The sole concrete evidence offered by Robinson to demonstrate such animus is his testimony and affidavit regarding Barrentine's remarks to him after the dispute with Fish. The statements Robinson attributed to Barrentine during his deposition, however, evince no racial animus at all. Advising a subordinate, in private, that his demeanor was inappropriate is not evidence of racial animus. If Barrentine suggested that Robinson should not speak "like you are equal," that would, of course, be evidence of racial animus. Robinson added this detail in his affidavit, even though he never mentioned the incident while speaking at length about it during his deposition. Given the nature of the supposed comment, it is implausible that it would have slipped Robinson's mind. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research & Development Co. v. Singer Co., 410 F.2d

---

[8] Robinson makes contradictory statements as to the quality of his performance review, but even the most damning interpretation is only that Barrentine did not like Robinson and wanted him replaced.
[9] Given the evaluations of Robinson's performance ultimately compiled by Brophy and Davis, Polk, racial animus is plainly not the only reason Robinson's supervisor might wish to replace him.

572, 578 (2d Cir. 1969) (rejecting conversation mentioned only in affidavit and not during deposition as a basis to deny summary judgment).  Accordingly, the alleged statement is not properly considered on this motion, and Robinson has presented no evidence of Barrentine's racial animus, other than his own conclusory statements in his deposition testimony and affidavit.  "Such bare, unsubstantiated allegations, which are not admissible at trial, do not establish a prima facie case of discrimination." Edwards v. City of New York, No. 03 Civ. 9407, 2005 U.S. Dist. LEXIS 34376, *43 (S.D.N.Y. December 16, 2005).

Robinson's allegations also fail to make out a prima facie case because he offers no evidence that Barrentine, regardless of racial animus, caused his termination.  As noted, mere conclusory assertions without any demonstrated basis of personal knowledge are not evidence, and Robinson has offered nothing more.  As he has conceded that none of AMEX's senior managers involved in his discharge bore any racial animus, there is no basis on which to infer that he was discriminated against.

Nor, finally, can racial discrimination be inferred directly from the underlying facts.  Riccardi, a white male, was terminated on the same day as Robinson.[10]  In the absence of any other direct or circumstantial evidence of discriminatory motivation, the obvious inference to be drawn is that AMEX terminated both Riccardi and Robinson on the basis of their involvement in the submission of inaccurate

---

[10] Robinson's allegation that another white male AMEX officer was allowed to resign rather than be fired after making an inaccurate submission to the SEC, see Robinson Aff. ¶ 37, actually undermines his argument. The key point to be taken from that allegation is not, as Robinson contends, that AMEX treated black and white employees slightly differently in the manner of their forced exit from the company. Rather, it is that AMEX removed from its employ officers who submitted inaccurate information to the SEC, regardless of their race.

13

information to the SEC.  Certainly, the evidence presented by Robinson provides no basis on which to infer that his discharge involved racial discrimination.

If Robinson had, however, satisfied that de minimis burden, he would still have failed to provide adequate evidence for a reasonable juror to conclude that AMEX merely used his actions on March 19, 2003 and his general mismanagement of DTA as a mere pretext for discrimination.  The internal investigation by Brophy, whom Robinson admits was not racially motivated, found his department in disarray.  The separate investigation conducted by Davis, Polk found that Robinson was culpable in providing inaccurate information to the SEC.  Moreover, the SEC threatened enforcement action, based in part on what they found to be willful production of misinformation, and pointing to AMEX's actions against Robinson and Riccardi as a mitigating factor.  Under these circumstances, it would have been surprising if AMEX had *not* terminated Robinson. His claim for discriminatory discharge cannot be maintained.

**B. Retaliation**

To establish a prima facie case of retaliation, Robinson must show: "'[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995) (alteration in original)).  In support of his retaliation claim, Robinson alleges that AMEX opposed his application for unemployment benefits in retaliation for his filing of an EEOC charge against the company.  See Compl. ¶ 45.  That claim is wrong.  AMEX opposed the unemployment benefits claim on July 25, 2003; but the EEOC charges were

14

not filed until five days later on July 30, 2003.  The alleged retaliation occurred prior to the protected activity, and so there can be no causal connection between the two.  Robinson's retaliation claim is dismissed.

**III. ERISA and Breach of Contract Claims**

Robinson's claim under ERISA is based on AMEX's failure to pay him severance benefits.  Robinson admitted that he was aware of no AMEX employee who received severance benefits after being terminated for cause, and AMEX contends no such employee has ever received them.  There is, moreover, no dispute that Robinson was terminated for cause.  Even were the Court to grant, which it does not, that there was evidence sufficient to find an AMEX severance benefits plan covered by ERISA, Robinson would clearly not be entitled to benefits under it.  Accordingly, the ERISA claims must also be dismissed.

Robinson also claims that AMEX's "policy and practice of paying bonus compensation to Robinson during his twenty-seven years of employment at the AMEX consistent with Robinson's performance level and position…constituted an implied and/or express contract." Compl. ¶ 121.  AMEX's reduction of his bonus from 2001 to 2002 and denial of a pro rata bonus for the portion of 2003 prior to his termination supposedly breached that contract. Id. at ¶ 122.  The reality, however, is that Robinson was an at-will employee without an employment agreement, and he presents no evidence to support the implied contractual right alleged.[11]  Robinson's contract claims are meritless.

---

[11] The Court also notes that Robinson's contract claims are totally inconsistent both with his deposition testimony regarding his expectations for his 2002 bonus and his affidavit statement that he received a good bonus in 2002.

15

## CONCLUSION

Defendants' motion for summary judgment is GRANTED, and Plaintiff's claims are dismissed in their entirety. The Clerk of the Court is directed to close out this case.

Dated:  New York, New York
       October 18, 2007

                                      SO ORDERED

                                      _____
                                      PAUL A. CROTTY
                                      United States District Judge

## CONCLUSION

Defendants' motion for summary judgment is GRANTED, and Plaintiff's claims are dismissed in their entirety. The Clerk of the Court is directed to close out this case.

Dated: New York, New York
       October 18, 2007

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge

Copies E-mailed By Chambers On: 10/22/07
By: Marlon Ovalles - C.R.D